JOSEPH BEAR, Appellee, *vs.* B. F. FLETCHER, Appellant.

*Opinion filed December 21, 1911.*

1. CONTRACTS—*effect of agreement to convey by warranty deed.* An agreement to convey by warranty deed is a covenant to convey a good merchantable title, however acquired, and is not an agreement to furnish a perfect title of record nor an abstract showing perfect title.

2. SAME—*when question involved is not whether an abstract of title is sufficient.* Where the vendor does not agree to furnish an abstract of title showing perfect title but only to convey by warranty deed, the question to be determined, on objection by the vendee to the title, is not whether the abstract of title shows a perfect title, but whether the vendor has proved, by the abstract and other competent evidence, that he was able to convey a merchantable title.

3. SAME—*an agreement to convey by warranty deed includes a title acquired by adverse possession.* Where the vendor expressly agrees to furnish the vendee with a perfect title of record and an abstract showing the same, the vendee will not be required to accept a title dependent upon adverse possession; but an agreement merely to convey by warranty deed is fulfilled by conveying good title, however acquired.

4. JUDICIAL SALES—*when discrepancy in name of a minor does not defeat sale of his interest.*  A discrepancy in the name of a minor does not defeat a guardian's sale of his interest in land, where process was served upon and the decree of sale was against the owner of the land and no advantage was taken of the discrepancy by plea in abatement.

5. FRAUD—*what is not such a misrepresentation as to value as defeats specific performance.*  A representation by the vendor's agent to the vendee, when the latter was inspecting the land, that the land was worth $60 per acre, is not such fraud as defeats specific performance at the suit of the vendor, even though the land was only worth $50 per acre.

6. SPECIFIC PERFORMANCE—*when vendor may have part performance and damages.*  Where a vendee is to pay a part of the consideration for land in horses, the fact that two of the horses accepted by the vendor died before their delivery to the vendor does not defeat the vendor's right to specific performance in so far as the vendee is able to perform and to damages for the value of the horses which died.

7. SAME—*when suit by vendor is not prematurely brought.*  A suit for specific performance begun by the vendor before the time fixed by the contract for delivering possession is not prematurely brought, where the vendee refused to carry out the contract and intimated that the vendor might start suit when he pleased.

8. SAME—*complainant not entitled to interest and also to rent.*  In decreeing specific performance it is inequitable to require the defendant to pay interest upon the agreed purchase price from the time he should have performed the contract and taken possession of the land, if the complainant has retained possession and collected the rents and profits for such period.

9. The court reviews the evidence in this case, and holds that it shows a good merchantable title in the vendor, and that the abstract of title, though imperfect in some minor details, shows title in the vendor to all of the premises.

APPEAL from the Circuit Court of Moultrie county; the Hon. W. G. COCHRAN, Judge, presiding.

E. J. MILLER, and JOHN E. JENNINGS, for appellant.

THOMAS S. WILLIAMS, JAMES H. SMITH, and W. K. WHITFIELD, for appellee.

Per CURIAM: This is an appeal from a decree of the circuit court of Moultrie county granting the specific performance of a contract for the sale of real estate, on a bill filed by the vendor against the vendee. The errors relied on for a reversal are, that appellee's title was not merchantable; that the contract was procured through fraud and misrepresentation as to the value of the land; that the decree is impossible of performance, and that the suit was brought prematurely.

On December 15, 1908, the following contract was entered into between the parties to this suit:

"Articles of agreement made and entered into between Joseph Bear, party of the first part of Edgewood, Illinois, and B. F. Fletcher, party of the second part, of Dalton City, Illinois, this 15th day of December A. D. 1908, the agreement whereas, that said Joseph Bear has bargained to sell, and will sell my farm of 220 acres in section 33, in Effingham county, Illinois, Mason township, for the stated amount $60 per acre to the said B. F. Fletcher, of Dalton City, Illinois, as follows: B. F. Fletcher pays in horses the amount of $4400, and said Mart Craig, agent of Joseph Bear, is to inspect the said horses of B. F. Fletcher or reject if said Mart Craig, agent of Joseph Bear, accept these horses of party of the second part then the said party of the second part is to give said party of the first part $800 cash in hand, making a total sum of $5200, and then give a mortgage of $8000 to party of the first part on said above described farm and party of the first part is to make Mr. Fletcher a warrant deed to above described land and it is further agreed that party of the second part is to pay party of the first part five per cent interest on the $8000. Interest due annually, said mortgage is to be made for the term of five years and that said party of the first part agrees to let party of the second part pay $100 or any multiple at any interest paying date, party of the first part agrees to give party of the second part possession the first day of March A. D. 1909.

"Entered by and between us this 15th day of December, 1908, before Oscar Hoffman, P. M., *ex-officio* J. P.

B. F. FLETCHER,<br>JOSEPH BEAR."

The evidence tends to show the following facts: Joseph Bear, appellee, resides in Edgewood, Effingham county, and B. F. Fletcher, appellant, lives at Dalton City, Moultrie

county. Before the contract was entered into between the parties Fletcher had some negotiations with a Mr. Robnett, who lives at Farina, Fayette county, in regard to exchanging some registered horses which Fletcher owned, for land. On the morning of December 15, 1908, Fletcher went to Farina to look at some land, for the sale of which Robnett had the agency. Upon arriving at Farina appellant was informed by Robnett that the farm that he intended to show Fletcher had been sold and that he had no other lands which he could trade him for his horses. Robnett introduced Fletcher to a real estate agent by the name of M. M. Craig, who resided in Farina and had the agency for the sale of appellee's farm, near Edgewood. Craig and appellant drove over to Edgewood, a distance of about fifteen miles, to the farm of appellee, arriving there in the forenoon. Appellee was not at home when the parties arrived. Craig took appellant to the farm and showed it to him. After looking over the farm appellant and Craig talked over the trade and made a tentative agreement. After looking at the farm the parties returned to appellee's home, and the terms of the agreement between appellant and Craig were stated by Craig to appellee, who assented thereto and procured a notary public who came to appellee's house and reduced the contract to writing, and the writing above set out was then signed by both parties. After the contract was signed appellant returned to his home at Dalton City, accompanied by Craig, who went with him, as the representative of appellee, to inspect and accept the horses which appellant was to let appellee have in part payment for the farm. The horses were examined by Craig on the 16th and accepted for appellee. Appellant delivered the pedigrees of the horses, prize emblements, ribbons, etc., belonging to the horses, arranged with Craig to borrow $700 from him of the $800 to be paid in cash under the contract and gave Craig a check for $100. Craig returned to Edgewood and informed appellee that the horses were satisfactory and that

252—14

he had accepted them. On the following day appellee went to Dalton City, taking a note and mortgage for appellant to execute, an abstract of title to the land and a warranty deed executed by appellee to appellant, for the purpose of closing up the transaction. The note was objected to by appellant because it contained a power of attorney authorizing the confession of a judgment thereon. Appellee readily consented that a note might be prepared with the objectionable clause omitted. Appellant remarked to appellee during the conversation, "I suppose the title to that land is all right." Appellee replied that the title was good and that he had an abstract with him, whereupon the abstract was handed to appellant, who took it to the cashier of a bank to be examined. The cashier of the bank declined to pass on the abstract, and thereupon the appellant asked for time enough to have the abstract examined, to which appellee assented. The abstract was then sent by appellant to Mills Bros., a law firm located at Decatur, Illinois, who, after keeping the abstract for several weeks, returned it to appellant with numerous objections noted to the title. The abstract, together with the objections pointed out to it by Mills Bros., was sent by appellant to appellee. Appellee then procured a new abstract to be made to meet the objections pointed out to the first abstract. The new abstract, together with a warranty deed, was submitted to appellant early in February, 1909. The second abstract was submitted to Mills Bros., and on the 23d day of February they returned the abstract to the appellant with a letter, saying: "The present abstract is in much better condition than the old one submitted to us, and while we are of the opinion that Joseph Bear has a merchantable title and he or anyone else can hold the land, yet we feel that under the existing conditions of farm lands and technical perfections of abstracts required in many instances, that the title should be perfected more completely than it has been, and we point out the following as some of the things that should be cor-

rected." Following this general statement the letter suggested six matters in respect to which the abstract should be corrected. Appellant sent this second abstract, together with the objection of Mills Bros., to appellee, and it was received by him on the 25th or 26th of February. In the meantime, on the 24th day of February, appellee filed his bill for specific performance of the contract, but appellant did not know that the bill had been filed until some time afterwards. The evidence shows that before the suit was commenced appellee made a formal tender of a warranty deed and requested appellant to execute the mortgage and carry out the contract, which he refused to do, basing his refusal on the ground that appellee's title was not good.

Between the date of the contract and the commencement of this suit a number of letters were written by appellant, some of them to appellee and others to Craig. All of these letters are in the record, but it will only be necessary to refer at this time to some of the statements contained in appellant's letters.

On the 19th of December, four days after the contract was signed, appellant wrote Craig a letter in which he said: "I had one man examine the abstract and he could not see that there was any title, so I am going to Decatur Monday and see a lawyer and get his opinion in the matter, so I will not ship the horses until about Wednesday, if the title proves all right." Again, on January 1, he wrote Craig, as follows: "I received your letter. I took the abstract to one man. He said there was nothing in it that was right. That put me to thinking, and I took it to Decatur and employed an attorney to look it over, and I have not heard from him is the reason I did not write you sooner. I got a letter from Bear urging me to ship the horses. I thought best not to tell him what I tell you. I got the Shire horse hurt. Was getting him shod. He got bruised under the belly and is now bruised and bleeding and running matter, and I don't know whether we can get him sound in time I

hear from the abstract or not, but rather than have any trouble, if you think best, will let the trade fall through. Of course, if Bear wants the horse in his present condition and the title is right when I hear from it I will ship, but honestly think for his own good he had better let the trade drop. Study over the situation and let me know what you think about it, and advise me if you think best to tell Bear about the Shire horse, and I will then write him and tell him about the Shire horse, as I thought best to write you first."

On January 11 appellant wrote Craig another letter, in which he said: "I have heard a little from the abstract but I am not in a position at this time to note all the objections. Will send the abstract and what I find in a day or two but don't think I can make the trade, and I am about to sell the sorrel horse, and you can send me the pedigrees by express and I will pay for them here at this end. So if you can sell the place, sell it, and don't wait on me one minute, and if you want me to send the abstract to you let me know by return mail and I will send it to Joseph Bear, together with objections noted and what must be done to make the title good."

On January 15 the appellant wrote to the appellee, saying: "Enclosed find objections to title and abstract; get those corrected, and then re-submit abstract for further examination."

On February 12 the appellant wrote Craig again, asking him to return the pedigrees of the horses to him at once, and on the 17th of February he again wrote, telling Craig that he expected to hold him for $1500 in damages for keeping the papers he had written for. He says: "I have lost the sale of one horse by you not returning those pedigrees when you could not make a sale. As for Bear, he has nothing to do with those horses. Does the contract say so?"

On February 18 the appellant wrote the appellee, saying: "Your letter received and I have not heard from the

abstract. Will let you know as soon as I hear, but I expect there will be a lawsuit. You might start any time you get ready." Again, on February 25, appellant said in a letter to appellee: "I am sending you abstract by express, prepaid, with objections thereon. As it is getting late you might call the trade off, if you care to."

The foregoing statement is a general outline of the uncontroverted facts. The evidence bearing upon the different assignments of error will be considered more in detail in connection with the questions to which it is applicable.

After answering the bill appellant filed a cross-bill for the purpose of compelling the return to him of the pedigrees and other papers pertaining to the horses, which he had delivered to appellee. The cause was referred to a special master, who took the evidence and reported to the court, finding for appellant as to the title to the farm and against him upon the question of fraud and misrepresentation. The master recommended a decree dismissing the bill for want of equity. Both parties excepted to the master's findings, and upon a hearing before the court appellee's exceptions to the master's report were sustained and a decree rendered in accordance with the prayer of the original bill and dismissing the cross-bill.

Appellant's first and most serious contention is, that appellee was not able to convey a good merchantable title to the land. In determining this question it is immaterial whether the title be considered as of the date when the contract was made, the time the bill was filed or when the decree was rendered, since the state of the title was the same throughout the whole time covered by the negotiations and dealings.

While appellee furnished an amended abstract and submitted other evidences of his title at different times in his effort to satisfy the appellant, he did not, at any time after the contract was made, buy in any outstanding claim or title or otherwise attempt to acquire any other additional title.

It will be noted by reference to the contract that appellee's obligation in respect to the character of title to be conveyed is only such as is required by the clause in the contract by which he agrees to convey by "warranty deed." These words in a contract for the sale of real estate are construed as a covenant to convey a merchantable title. (*Brown* v. *Cannon,* 5 Gilm. 174; *Morgan* v. *Smith,* 11 Ill. 194; *Gradle* v. *Warner,* 140 id. 123.) The agreement did not require an abstract showing a perfect title of record. Appellant, apparently, loses sight of the distinction between a contract to furnish a perfect title of record or to furnish an abstract showing a perfect title, and a general agreement to convey a good merchantable title. Where the language of the contract requires the vendor to furnish the vendee with a perfect record title and an abstract showing the same, the purchaser will not be required to accept a title dependent upon adverse possession, since a good title of record is of a higher character and more desirable than one dependent upon extrinsic circumstances to be established by parol evidence. (Waterman on Specific Performance, 553; *Morgan* v. *Smith, supra; Attebery* v. *Blair,* 244 Ill. 363.) A contract like the one here involved, which merely obligates the vendor to convey a merchantable title, is fulfilled when the grantor conveys a perfect title, however acquired. Cases cited by appellant like *Smith* v. *Hunter,* 241 Ill. 514, and other cases in line with it, where the contract required an abstract showing a good merchantable title, are not applicable to the case before us and are clearly distinguishable therefrom. The question here is not the sufficiency of the abstract, but, did appellee prove by the abstract and other competent evidence that he was able to convey a merchantable title?

The most serious objection urged by appellant to appellee's title arises out of the following facts: Appellee's father, Jacob Bear, died testate thirty-one years before the trial of this case, owning one hundred acres of the land in

question. He left a widow and nine children. The widow, Mary Bear, has been dead fourteen years. The appellee acquired title by deeds from all of his brothers and sisters except Franklin P. Bear, who died December 17, 1878, leaving one child, a boy, who is known in this record as Arthur F. Bear, Harvey F. Bear and Franklin P. Bear, and the widow, Mary J., who afterwards married a man by the name of Maddon. The petition for letters of administration on the estate of Franklin P. Bear states that the deceased left one child, whose name is given as Arthur F. Bear. The mother of this child filed a petition asking that Solomon Mesnard be appointed guardian for Harvey F. Bear, a minor of the age of three years, on the 23d day of October, 1881, and letters of guardianship were accordingly issued to Mesnard of Harvey F. Bear on the 17th day of December, 1881. Afterwards, in 1884, Mesnard, as guardian, filed a petition in the county court of Effingham county, representing that Franklin P. Bear was a minor residing in Effingham county, and that he was appointed guardian of said Franklin P. Bear on the 17th day of December, 1881; that said Franklin P. Bear was an heir of Jacob Bear, his grandfather, and the owner of the undivided one-ninth interest (subject to the dower of Mary J. Bear) of a part of the lands involved in this controversy. The record shows that proceedings were had resulting in a decree for the sale of the ward's interest in said lands, and that the same were sold and the sale was duly approved on the 18th of March, 1884. Appellee claims title to a one-ninth interest under this guardian's sale.

The objection raised to the title is based on the discrepancy in the names by which the son of Franklin P. Bear was known at different times. This confusion as to the name of this boy is clearly explained by the evidence. It appears that the name first given to this child, and the one under which he was christened, was Arthur Franklin. The child was born October 23, 1878. His father died Decem-

ber following. After his father's death his mother changed his name to Franklin Pierce, which was the name his father had. The evidence shows that in 1887 Henry B. Kepley was appointed guardian of Franklin P. Bear at the request of his mother, Mary J. Maddon. All of the evidence in which any reference is made to this boy shows that he was the only child of Franklin P. Bear and that he was born on October 23, 1878. The testimony leaves no doubt that Arthur F. Bear and Franklin P. Bear (sometimes also called Harvey F. Bear) are one and the same person. The proof shows that the summons was served upon the owner of this land in the proceeding to sell by the guardian. The decree for the sale of this real estate was against the owner, and if he was sued by the wrong name but process was served upon him and he failed to take advantage of the mistake by plea in abatement, he would be bound by the decree,—and this rule applies as well to infants as to adult defendants. (*Pond* v. *Ennis,* 69 Ill. 341.) The guardian sale divested this ward's interest, and the objection to the title based on the discrepancy as to his name cannot be sustained. The remainder of the land was formerly owned by Thomas Goodnight, who died over forty years ago, and the title to that portion of the farm passed from his heirs to appellee. All of the other objections to the title are of a technical character and go rather to the form of the conveyances than to the title itself. The abstract, on its face, shows title in appellee to all of the premises, but there are some slight imperfections in some of the deeds in the chain of the title, such as the want of a seal to a deed; the absence of a certificate of magistracy where the acknowledgments were taken by a justice of the peace in a foreign county or State; the failure to produce the original patents; and the omission in some of the deeds of a clause waiving the homestead without any proof that the grantor had a homestead, and other like objections. Most of these objections relate to deeds that are from twenty to thirty years old, and all

of them were executed more than seven years before the contract was entered into. In addition to the conveyances which covered the whole title and all interest in the land, appellee introduced the record of a proceeding to quiet his title, which was had in 1898, to which all persons who had any claim to any portion of the land were made parties, which resulted in a decree quieting the fee simple title in appellee. Appellee also proved actual adverse possession of the entire premises for more than twenty years, together with proof that he had paid all taxes assessed against the land during that period. This evidence was amply sufficient to justify a finding that appellee had a merchantable title to the land.

Appellant makes the further contention that he was induced to sign the contract by fraud and misrepresentation as to value of the land. The evidence on this point is, that Craig told appellant that the land was worth $60 per acre and that he could sell it for $65 an acre in two weeks. The testimony is conflicting as to the value of the land. The estimates of the witnesses range all the way from $30 per acre to $70. The special master found the cash value to be $50 per acre, and this finding is well supported by the testimony. While the weight of the evidence tends to show that Craig's estimate of the value was somewhat above the average, yet there are other witnesses who were well qualified to express opinions on the subject who fixed the value as high as $60 per acre, and one witness testified that $70 per acre would not be too high a valuation in a trade. Conceding the facts to be as appellant contends, and that Craig told him the farm was worth $60 per acre when, in fact, it was worth only $50, this fails to establish such fraud and misrepresentation as to defeat appellee's right to specific performance. The rule upon this subject is, that unless the inadequacy of price is such as shocks the conscience and amounts, in itself, to conclusive and decisive evidence of fraud in the transaction, it is not a sufficient

ground for refusing a specific performance. (*Zempel* v. *Hughes*, 235 Ill. 424.) In the case above cited this court had occasion to review numerous authorities upon this subject, and the conclusion there reached was that a party had a right to praise his property, and that the mere expression of opinion as to its value will not ordinarily be held to be fraud or misrepresentation. Appellant has not sustained his charge of fraud under the rule established by the authorities.

Appellant contends that the decree ought to be reversed because two of the horses that he agreed to deliver to appellee had died before the rendition of the decree and the decree required him to deliver the entire lot of horses. The two horses that died were valued in the trade at $500 each. The decree requires appellant to specifically perform the contract. The mere circumstance that he is not able to deliver the identical animals that were sold is no reason why he should not be required to specifically perform the contract in so far as it can be performed and compensate the appellee in damages for that part of the contract that is impossible of performance. While the general rule is that upon the breach of a contract for the sale and purchase of real estate the person injured thereby has the choice of remedies either to sue for specific performance or damages, and cannot, in general, obtain both in relation to the same transaction, yet the rule is also recognized that a party may have specific performance generally, and damages for acts which do not admit of a decree for specific performance. (Waterman on Specific Performance, sec. 5, and authorities cited.) An illustration of this rule is given by Waterman, as follows: Where, in a contract to take a lease for a certain term, the lessee agreed to tear down a house on the premises and erect a new one, it was held that the lessor might obtain specific performance as to the lease and damages for not building the house, the court not having the power to decree specific performance as to the latter. Nu-

merous other illustrations are given by this author in a foot note to section 5. The decree in this case requires appellant to perform his contract, and in default it orders a sale of the premises for the purpose of paying appellee the consideration for the farm. Such a decree is authorized by *Corbus* v. *Teed*, 69 Ill. 205, and *Attebery* v. *Blair, supra.*

Appellant finally contends that this suit was prematurely brought. This contention has no foundation in the facts. Appellant had clearly indicated an intention on his part not to carry out the contract before the suit was brought, and in one of his letters to appellee he told him that he might commence his suit as soon as he was ready, or words to that effect. After the appellant had repudiated the contract and notified appellee that he did not intend to carry it out, appellee was not required to wait until the day possession was to be delivered before bringing his suit.

While we are of the opinion from what has been said that the appellee is entitled to have the contract specifically enforced as against the appellant, the relief granted to the appellee by the decree here under review is such that it must be reversed. The decree entered by the trial court requires "the appellant to turn over and deliver to the appellee the aforesaid described horses and that he pay to said appellee the sum of $800 in cash, together with five per cent interest thereon from the first day of March, A. D. 1909, and that he execute and deliver to the appellee his promissory note for the sum of $8000, dated March 1, A. D. 1909, due five years after date and drawing five per cent interest per annum, due and payable annually, and that to secure the payment of said note he execute and deliver to the appellee a good and sufficient mortgage deed of conveyance on said described lands." The decree then provides the master shall tender to the appellant a deed to said premises, and "in case the appellant shall fail or refuse to pay said $800 in cash, with interest thereon, and shall fail and refuse to turn over and deliver to said appellee each and

every of said horses," and otherwise to comply with said decree, the master "shall proceed to sell said described lands, or so much thereof as shall be sufficient to realize the said sum of $13,200, with interest thereon at the rate of five (5) per cent from the first day of March, A. D. 1909," and that the master, out of the moneys received from said sale, shall retain his fees, disbursements and commissions of said sale and pay the costs of suit, "and out of the remainder of said money he pay to the appellee in this suit the sum of $13,200, with interest thereon at the rate of five (5) per cent from the first day of March, A. D. 1909, to the date of the sale," and that if said premises shall not sell for enough to satisfy said decree he report the same to the court and that a deficiency decree be entered against the appellant for the amount remaining unsatisfied.

The evidence showed that two of the horses had died prior to the entering of the decree. The appellant could not, therefore, comply with the decree entered against him, and the court might as properly have entered a decree requiring the appellant to pay the entire agreed price of said horses ($4400) in lieu of said horses, with interest thereon at five per cent from March 1, 1909, as to have entered the decree that was entered, as that was the effect of the decree. The evidence showed that the value of the two horses which had died was $1000. The decree should have provided the appellant should deliver the three horses which were alive, to the appellee and pay him $1000 in cash in lieu of those that were dead, instead of requiring him to deliver to the appellee the two horses which were dead, and to that extent the decree of the circuit court should be modified.

The decree also required the appellant to pay interest on deferred payments due from the appellant to the appellee at five per cent from March 1, 1909, and until the decree should be satisfied, but failed to charge the appellee with the amount he received, or could have reasonably re-

ceived, from the use of said land during the time the appellant is decreed to pay interest to the appellee. It would be inequitable to require the appellant to pay interest to the appellee on the purchase money from March 1, 1909, and at the same time permit the appellee to enjoy the use and occupancy of the land which the purchase money represents, and the decree was also erroneous in that particular. *Marx* v. *Oliver,* 246 Ill. 316.

It is said the appellant did not prove that the appellee had remained in possession of the land, or that he received an income therefrom, after March 1, 1909. In his bill the appellee offered specifically to perform the agreement, "and to let him [the appellant] into the possession of the rents and profits thereof according to the tenor and effect of said agreement." The agreement provided the possession of the lands should be delivered to the appellant on March 1, 1909. Clearly, if the appellant is to pay interest from that date he should receive rent from that date, and if the proofs were defective on the question of rents the court should not have entered a decree for interest without being advised, from the proofs, upon the question of rents. Upon remandment the cause should be re-referred to the master to state an account of the rents and profits received from the land since March 1, 1909, and appellee should be charged with what he received or could reasonably have received from the land, and credited with what he has paid out for taxes and improvements from March 1, 1909, until the date of the statement of the account, unless it appears from the evidence that on March 1, 1909, the appellee offered to surrender the possession of said farm to the appellant and that the appellee after that date did not continue in the possession and control of said farm.

The decree of the circuit court will be reversed and the cause will be remanded for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*